FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

|                          |   |                              |
|--------------------------|---|------------------------------|
| VISTA INDIA,             | ) | Hon. Harold A. Ackerman      |
|                          | ) |                              |
| Plaintiff,               | ) | Civil Action No. 07-1262 (HAA) |
|                          | ) |                              |
| v.                       | ) | **OPINION AND ORDER**        |
|                          | ) |                              |
| RAAGA, LLC,              | ) |                              |
|                          | ) |                              |
| Defendant.               | ) |                              |

_____)

A. Michael Covino, Esq.
BUDD LARNER, P.C.
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
*Attorneys for Plaintiff*

Joyce M. Mocek, Esq.
Craig N. Johnson, Esq.
Neil L. Arney, Esq.
KUTAK ROCK, LLP
225 Peachtree Stree NE, Suite 211
Atlanta, Georgia 30303
*Attorneys for Defendant*

## ACKERMAN, Senior District Judge:

This matter comes before the Court on Plaintiff Vista India's ("Vista") motion (Docket No. 3) for a preliminary injunction to enjoin Defendant Raaga, LLC ("Raaga") from utilizing the RAAGA mark, particularly in connection with Defendant's website raaga.com. On July 12, 2007, this Court held a hearing on the instant motion and reserved decision. For the following reasons, Plaintiff's motion is DENIED.

1

A.      **Background**

Plaintiff Vista is the owner of "Raaga Entertainment Superstores," which is purportedly the "largest retailer of Indian and other South Asian music within the United States."[1]  (Compl. at ¶ 10.)  Vista is also an "authorized distributor for Sony Music India, Tips, RPG, and Yashraj, major Indian music distributors."  (*Id*. at ¶ 11.)  The Complaint states that, "[a]t its height" there were "six locations throughout the United States–New Jersey, New York, Pennsylvania, Missouri and California."[2]  (*Id*. at ¶ 15.)

Defendant Raaga owns and operates the Internet site "raaga.com" (hereinafter the "website"), through which it is engaged in the business of providing Indian music via downloads and "streaming" technology.[3]  Raaga has been operating the website–accessed by customers and subscribers in the United States and worldwide–since 1998.[4]  Raaga is licensed to stream music

---

[1] The Complaint states that the name of the stores is "Raaga Entertainment Superstores," but Vista's associated Internet site describes its stores as "Raaga Megastores."  Furthermore, an Internet search revealed that the store in Edison, New Jersey is listed as "Raaga Megastores."  But Vista's first store in Edison was originally called "Raaga Music."

[2] Vista's Internet site currently lists five locations for stores: two in New Jersey, one in New York, and two in California.  At the hearing, Vista admitted that it now has three stores, one in each of the following locations: Edison, New Jersey; Los Angeles, California; and Sunnyvale, California.

[3] "Streaming media is multimedia that is continuously received by, and normally displayed to, the end-user while it is being delivered by the provider.  The name refers to the delivery method of the medium rather than to the medium itself."  http://en.wikipedia.org/wiki/Streaming_media.

[4] In 2001, Vista launched its website "myraaga.com," through which it sells Indian and South Asian music CDs.  Vista's website does not appear to offer music for downloading or streaming.  Instead, customers order CDs and Vista ships them via post.  Vista's website "myraaga.com" is listed as the 3,085,066th most visited site on the Internet, as opposed to Raaga's "raaga.com," which is listed as the 806th most visited site.  *See* http://www.alexa.com (last visited August 1, 2007).

2

by "Broadcast Music, Inc., the South India Music Companies Association (with 40 plus member labels), Vel Records, Aditya Music, TriStar Music, and others."[5]  (Raaga Br. at 3.)  Raaga's founder, Senthil Venkataramani, asserts that he first became aware of Vista's stores "in or around 2000, while living in California.  At that time, Mr. Venkataramani had been using the RAAGA mark for approximately 3 years or more."  (*Id.* at 4.)  At the hearing, however, he testified that the first time he became aware of a Vista store was in 2002.  (Hearing Tr. 134:10-17.)

On January 11, 2005, Raaga filed two trademark applications with the United States Patent & Trademark Office ("USPTO"), one for the word mark RAAGA and one for the word mark RAAGA with stylized letters.  Both applications sought protection of the mark in International Class 38, for "streaming of audio, music material on the Internet" and in International Class 41, for "entertainment services, namely providing prerecorded music, information in the field of music, videos and movies and commentary and articles about music, video, and movies all on-line via a global computer network."[6]  The examining attorney at the

---

[5] As will be discussed later, there is a considerable dispute regarding whether Raaga is in fact licensed to sell or stream some of the music on its website.  But for purposes of this <u>trademark</u> case, that <u>copyright</u> dispute is completely irrelevant.

[6] "As of September 1, 1973, the international classification of goods and services is the primary classification used by the United States, and it applies to all applications filed on or after September 1, 1973, and their resulting registrations, for all statutory purposes. *See* 37 C.F.R. §2.85. . . . The international classification schedule for goods and services is found in 37 C.F.R. §6.1, and the prior United States classification schedule for goods and services is found in 37 C.F.R. §6.2." *See* United States Patent and Trademark Office, Trademark Manual of Examination Procedures ("TMEP") § 1400 (4th ed. April 2005), *available at* http://tess2.uspto.gov/tmdb/tmep.
    International Class 38 is the "telecommunications" class, which "includes mainly services allowing at least one person to communicate with another by a sensory means.  Such services include those which: (1) allow a person to talk to another, (2) transmit messages from one person to another, and (3) place a person in oral or visual communication with another (radio and television)." *See* TMEP § 1401.02(a).  International Class 41 is the "education and

USPTO has refused registration of the RAAGA mark on the grounds that the mark is "'merely descriptive' of the music-related services." (Raaga Br. at 5 (citing Venkataramani Decl. at ¶ 12, Exs. C, H).)

On July 14, 2006, more than 18 months after Raaga filed its trademark applications, Vista filed an application with the USPTO to register the RAAGA mark under International Class 41 for "entertainment in the nature of visual and audio performances, and musical, variety, news, and comedy shows, entertainment services namely providing pre-recorded music and movies for retail." (Venkataramani Decl., ¶ 16, Ex. L.) Vista's application has been suspended pending the applications filed by Raaga. (*Id.*) In November and December 2005, Vista contacted Raaga to discuss the possibility of Vista acquiring Raaga, with Vista allegedly offering $100,000, which Raaga refused. As Suri Gopalan, the owner and President of Vista, testified at the hearing, "we needed to go on the internet. The only way [Vista's] stores could exist was on the internet. People were downloading or stream[ing] on the internet. So selling CDs was becoming harder." (Hearing Tr. 69:24 to 70:2.) After these discussions in late 2005, Raaga had no communication with Vista until the commencement of this action. However, Raaga asserts that Vista has "threatened litigation against several of the entities with which Raaga has licenses . . . and provided them copies of the complaint in this case." (Raaga Br. at 7.) Notably, Vista does not own any copyrights over the works on Raaga's website. (*See* Hearing Tr.

---

entertainment" class, which "contains mainly services rendered by persons or institutions in the development of the mental faculties of persons or animals, as well as services intended to entertain or to engage the attention." *Id.*

81:7-12.)[7]  Nevertheless, Raaga declares that Vista's threats have apparently had some effect because two companies "with whom Raaga has been negotiating for a license, have indicated that they will not issue a license to Raaga as a result of the statements and threats from Vista."  (*Id.*)

On March 16, 2007, Vista filed a five-count Complaint alleging common-law trademark infringement and unfair competition, as well as federal unfair competition against Raaga.[8]  On April 12, 2007, Vista filed a motion for a preliminary injunction seeking to enjoin Raaga from using the "Raaga" mark, particularly in connection with Raaga's Internet site "raaga.com."  On April 24, 2007, this Court issued an Order to Show Cause directing Raaga to respond to Vista's motion for a preliminary injunction and scheduling a hearing on the matter for May 23, 2007. That hearing was postponed until July 12, 2007.  On May 10, 2007, Raaga filed its Answer along with five counterclaims.[9]

---

[7]  "Q.  Mr. Gopalan, Vista India doesn't own any copyrights to any music, does it?
A.  No, we don't.
Q.  And you don't have any right to enforce any copyrights of Indian music in the United States, do you?
A.  No, I don't."
(Hearing Tr. 81:7-12.)

[8] Count One: violation of the federal Anticybersquatting Consumer Protection Act, which amends the Lanham Act.  Count Two: common law trademark infringement and unfair competition.  Count Three: federal unfair competition, in violation of the Lanham Act.  Count Four: "federal unfair competition: reverse confusion."  Notably, there is no substantive difference between Vista's third and fourth Counts; the only difference appears to be the titling of the Counts.  Vista does not allege *statutory* trademark infringement, but instead alleges a statutory unfair competition violation of the Lanham Act.  Count Five: tortious interference with prospective economic advantage.

[9] Counterclaim One: declaratory relief that (1) Raaga's use of the mark qualifies it for common law trademark protection; and (2) Raaga's use was prior to Vista's thereby giving Raaga superior rights.  Counterclaim Two: common law trademark infringement.  Counterclaim Three: unfair competition in violation of the Lanham Act.  Counterclaim Four: tortious

5

B.      **Analysis**

Four factors must be satisfied for a preliminary injunction to issue:

> [1] the likelihood that the applicant will prevail on the merits at final hearing; [2] the extent to which the plaintiffs are being irreparably harmed by the conduct complained of; [3] the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; [4] and the public interest.

*Opticians Assoc. of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 191-92 (3d Cir. 1990) (citation omitted).  "All four factors should favor preliminary relief before the injunction will issue."  *S & R Corp. v. Jiffy Lube Int'l., Inc.*, 968 F.2d 371, 374 (3d Cir. 1992).  It has often been stated that a court considering a motion for a preliminary injunction must adhere faithfully to the aphorism that "to doubt is to deny."  *Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3rd Cir. 1937); *see also Campbell v. City of New Kensington*, No. 05-0467, 2006 WL 3308362, at *1 (W.D. Pa. Oct 16, 2006); *Bernstein v. Goldsmith*, No. 05-4702, 2006 WL 1644849, at *4 (D.N.J. Jun 05, 2006).

1.      **Vista Does Not Have a Reasonable Probability of Success on the Merits for Its Lanham Act and Common Law Trademark Infringement and Unfair Competition Claims Because the RAAGA Mark Is Not Valid or Legally Protectable**

"Both the common law and Congress have provided protection to the holders of recognized trademarks to prevent others from appropriating or copying them and taking advantage of the owner's good will for their own benefit."  *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 777 (8th Cir. 2004).  "Congress enacted the Lanham Act over fifty years ago to protect the

---

interference with contract.  Counterclaim Five: tortious interference with prospective economic advantage.  Counterclaim Six: trademark misuse.

value of trademarks by encouraging their registration . . . and to provide a federal cause of action to prevent their misappropriation."  *Id.*  A primary purpose of the Lanham Act "was to ensure that 'where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.'"  *Id.* at 777-78 (internal citations omitted).

The Lanham Act provides a cause of action for trademark infringement, 15 U.S.C. § 1114, and unfair competition, 15 U.S.C. § 1125.[10]  The analysis for both causes of action is the same, *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005), and requires the plaintiff to prove that (1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services.  *Opticians*, 920 F.2d at 192; *see also Freedom Card*, 432 F.3d at 470.

Importantly, the analysis for New Jersey statutory and common law trademark claims is the same as that under the Lanham Act.  *See J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 374 (D.N.J. 2002) ("[T]he elements for a claim for trademark infringement under the Lanham Act are the same as the elements for a claim of unfair competition under the Lanham Act and for claims of trademark infringement and unfair competition under New Jersey statutory and common law"); *Harlem Wizards Ent. Basketball, Inc. v. NBA Properties, Inc.*, 952 F. Supp.

---

[10] The Lanham Act distinguishes between "trademarks" and "service marks," but the differences do not appear to be relevant in this matter.  Moreover, Vista does not distinguish between the two in its Complaint or brief.  As a result, Raaga's brief, after noting Vista's conflation, likewise conflates the two marks and simply references the "trademark."  Similarly, this Court refers to the RAAGA mark as a trademark, regardless of whether it is a trademark or service mark in the particular discussion at hand.

7

1084, 1091 (D.N.J. 1997) ("N.J.S.A. 56:4-1 is the statutory equivalent of Section 43(a)(1) of the Lanham Act and the analysis for trademark infringement under New Jersey common law is the same as under Section 43(a)(1)").  Therefore, this Court will analyze Vista's claims through caselaw that usually refers to the Lanham Act, but in so doing this Court's conclusions will apply to both the federal and state claims.

The terms "trademark" and "service mark" "include[] any word, name, symbol, or device, or any combination thereof" used by a person "to identify and *distinguish*" the marks from the goods or services of others.  *See* 15 U.S.C. § 1127 (emphasis added).  "The general rule regarding distinctiveness is clear: An identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning."  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992) (citation omitted).  In other words, "[i]f the mark at issue is federally registered and has become incontestible, then validity, legal protectability, and ownership are proved."  *Commerce Nat. Ins. Services, Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000).  Otherwise, "validity depends on proof of secondary meaning, unless the unregistered or contestable mark is inherently distinctive."  *Id*.  The RAAGA mark is not federally registered and therefore not inherently distinctive on that basis.

"Marks are often classified in categories of generally increasing distinctiveness; following the classic formulation set out by Judge Friendly, they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful."[11]  *Two Pesos, Inc.*, 505 U.S. at 768 (citing *Abercrombie*

---

[11] The Third Circuit has articulated this list by combining the fourth and fifth classifications and providing examples for each: "(1) generic (such as 'DIET CHOCOLATE FUDGE SODA'); (2) descriptive (such as 'SECURITY CENTER'); (3) suggestive (such as

& *Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)).  "A mark is *inherently distinctive* if it may be fairly characterized as arbitrary, fanciful, or *suggestive*."  *Commerce*, 214 F.3d at 438 n.5 (emphases added).  By contrast, a generic mark receives no protection whatsoever.  *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir. 1986) ("[I]f we hold a designation generic, it is never protectable because even complete 'success . . . in securing public identification . . . cannot deprive competing manufacturers of the product of the right to call an article by its name.'") (citation omitted).  If the mark is merely *descriptive*, then protection may be afforded if the mark acquires secondary meaning.  Secondary meaning "is established through extensive advertising which creates in the minds of consumers an association between the mark and the provider of the services advertised under the mark."  *Commerce*, 214 F.3d at 438.  "A plaintiff must establish secondary meaning in a mark *at the time and place* that the *defendant began* use of the mark."  *Id.* (emphases added).

Vista asserts that its RAAGA mark is "suggestive" such that it warrants the conclusion of being "inherently distinctive" and therefore valid and legally protectable.  Raaga argues that the term is "merely descriptive."  Thus, it would appear that the first question is whether the RAAGA mark is suggestive or descriptive.  If the former, then validity and legal protectability are established.  If the latter, then the question is whether the mark has acquired secondary meaning.  However, Vista and Raaga both have a vested interest in not having the mark declared "generic" because such marks are not protectable and therefore neither party would have the right

---

'COPPERTONE'); and (4) arbitrary or fanciful (such as 'KODAK')."  *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 221 (3d Cir. 2000).  The Supreme Court has also acknowledged the same and other examples, such as "Camel" cigarettes (arbitrary); "Kodak" film (fanciful); "Tide" laundry (suggestive).  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210-11 (2000).

to exclude others from its usage.  Considering Raaga's application to the USPTO for registration

of the trademark and its counterclaims for trademark infringement and unfair competition, it is

obvious that Raaga does not want this Court to determine that the mark is simply generic, even

though such a declaration would clearly defeat Vista's preliminary injunction motion.

Nevertheless, there is a reasonable basis for concluding that the mark is "generic."


### *a*)      **Genericness - Foreign Words**

"Underlying the genericness doctrine is the principle that some terms so directly signify

the nature of the product that interests of competition demand that other producers be able to use

them even if terms have or might become identified with a source and so acquire 'de facto'

secondary meaning."  *A.J. Canfield Co.,* 808 F.2d at 304.  "[T]o establish a trade name in the

term . . . the plaintiff must show that the primary significance of the term in the minds of the

consuming public is not the product but the producer."  *Kellogg Co. v. Nat'l Biscuit Co.*, 305

U.S. 111, 118 (1938); *see also A.J. Canfield Co.,* 808 F.2d at 299.  "[T]he primary significance

test is generally satisfied if a term signifies a product that emanates from a single source, i.e., a

product brand, but it is not satisfied if the product that emanates from a single source is not only

a product brand but is also a product genus."  *A.J. Canfield Co.,* 808 F.2d at 301.  "Marks that

constitute a common descriptive name are referred to as generic.  A generic term is one that

refers to the genus of which the particular product is a species."  *Park 'N Fly, Inc. v. Dollar Park

and Fly, Inc.*, 469 U.S. 189, 194 (1985); *see also A.J. Canfield Co.,* 808 F.2d at 298.  "Courts

refuse to protect a generic term because competitors need it more to describe their goods than the

claimed markholder needs it to distinguish its goods from others."  *A.J. Canfield Co.,* 808 F.2d

at 304.

"Only if a term's meaning to the *relevant consuming public* is discovered can regulation of that term properly influence purchasing decisions and comport with relevant precedent." *Berner Intern. Corp. v. Mars Sales Co.*, 987 F.2d 975, 982 (3d Cir. 1993) (emphasis added); *see also In re Merrill Lynch*, 828 F.2d 1567, 1569-70 (Fed. Cir. 1987) ("It seems elementary that one must find out how people in the trade and the purchasers use the terms with respect to the involved goods in order to determine whether or not they are descriptive.").

"Because of the diversity of the population of the United States, coupled with temporary visitors, all of whom are part of the United States marketplace, commerce in the United States utilizes innumerable foreign languages." *Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir. 1999). As a result, "[n]o merchant may obtain the exclusive right over a trademark designation if that exclusivity would prevent competitors from designating a product as what it is in the foreign language their customers know best." *Id.* at 271. Therefore, under this doctrine of foreign equivalents, generic foreign words are ineligible for protection. *Id.* Furthermore, "a foreign word is ordinarily translated into English" to determine whether that word is generic, descriptive, or suggestive. *See Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 38 (1st Cir. 2006).

In the instant matter, Vista asserts that the term "raaga" "is the Hindi word for 'rhythmic patterns' and signifies certain melodic patterns in Hindi music."[12] (Pl.'s Br. at 6.) However, it

_____

[12] The Hindi language "was originally written with the Brahmi script, but since the 11th century AD it has been written with the Devanagari alphabet." http://www.omniglot.com/writing/hindi.htm. As a result, the term's transliteration can result in multiple versions, e.g., raaga, raga, rag.

appears that the word may have a broader, although not entirely different, meaning.  For

example, one source indicates that it means "hymn" or "incantation."

http://www.wordanywhere.com.  By contrast, a musical website teaches that the word literally

"means color, mood or feeling.  Raaga is so called because it creates a particular mood in the

listeners.  Raaga is a central concept in Indian music.  A Raaga has many aspects to it.  Only

when all the aspects or characteristics of a Raaga are adhered to does the music sound like a

Raaga."  http://www.musicalnirvana.com/introduction/raaga_basics.html.  Yet another source

teaches the following:

> The *rag* is the most important concept that any student of Indian
> music should understand.  The Hindi/Urdu word '*rag*' is derived from
> the Sanskrit '*raga*' which means 'colour, or passion.'  It is linked to
> the Sanskrit word '*ranj*' which means 'to colour.'  Therefore *rag* may
> be thought of as an acoustic method of colouring the mind of the
> listener with an emotion.  This is fine as a general concept but what
> is it musically?  It is not a tune, melody, scale, mode, or any concept
> for which an English word exists.  It is instead a combination of
> different characteristics.  It is these characteristics which define the
> *rag*.

 http://www.chandrakantha.com/articles/indian_music/raga.html.  Finally, an article in the

February 5, 2000 edition of Billboard magazine, attached as an exhibit to the Complaint, focused

on Vista's business and explains that "raaga" is a name that "derives from the Sanskrit word

representing all kinds of Indian classical music."  (Compl. Ex. B.)

        In reviewing the websites of both parties–raaga.com and myraaga.com–there is nothing to

indicate that "raaga" is a particular category, or sub-classification, of Indian music.  That is, a

visitor to both sites can search by category of Indian music, e.g., Hindustani, Carnatic, Classical,

Fusion/New Age, or by geographical region of South Asian music, e.g., Tamil, Telugu,

Malayalam.  In other words, it would appear that "raaga" is understood by the relevant

consuming public as a simple reference to Indian and/or South Asian music generally.

In *Otokoyama*, the Second Circuit reversed the district court's grant of a preliminary

injunction against an importer of Japanese *sake*.[13]  175 F.3d at 272.  At issue in that case was the

Japanese word "otokoyama."  In Japanese, the term is comprised of the pictograms for "man"

and "mountain," but the parties agreed that since at least the 17th century the term "otokoyama"

has been used to refer to *sake*.  *Id*. at 268.  The Court noted that "between ten and twenty

brewers" in Japan designate their respective *sake* as "otokoyama" and they often add a

geographical modifier to distinguish their brand.  *Id*.  The district court found a likelihood of

success on the merits and granted the preliminary injunction without allowing the defendant to

introduce evidence of the meaning of the word "otokoyama" in Japanese.  The Second Circuit

reversed on this basis, concluding that "[t]he meaning of otokoyama in Japanese . . . was

therefore highly relevant to whether plaintiff may assert the exclusive right to use that word as a

mark applied to *sake*."  *Id*. at 272.  The *Otokoyama* court suggested that if "otokoyama" was

commonly understood in Japanese to refer to *sake*, then the defendant had a strong argument that

protection was not available because the mark was generic.  *Id*.

Similarly, the Fifth Circuit, in *Enrique Bernat F., S.A. v. Guadalajara, Inc.*, reversed the

district court's grant of a preliminary injunction regarding competitive distributors of Spanish

lollipops.  210 F.3d 439, 445 (5th Cir. 2000).  The *Enrique* court addressed the proper

interpretation of the word "chupa."  While observing no abuse of discretion in the district court's

finding that the word meant "to lick" or "to suck," the court of appeals concluded that "[t]he

---

[13] *Sake* is a wine made from fermented rice.

evidence in the record suggests that 'chupa' does generically designate 'lollipops.'"  *Id.* at 444.

Undergirding this conclusion was the fact that "other lollipops in Mexico use the term 'chupa' in

their marks."  *Id.*  As a result, the Fifth Circuit held that there was no likelihood of success on the

merits of plaintiff's trademark claim.  *Id.* at 445.

Analogously, if "raaga" literally means color or passion or rhythmic patterns, but it is

commonly understood to refer to Indian or South Asian music generally, then it follows that the

RAAGA mark is not protectable because it is a generic term in Hindi and to the relevant public

that purchases Indian and South Asian music.  This is a crucial issue that the Court endeavored to

explore at the hearing.  The Court notes again that both parties have an incentive to avoid the

"generic" issue, lest the Court rule that the mark is generic and then both parties have no

protectable interest.  Perhaps as a result of their somewhat parallel interests, the parties did not

specifically address the issue of genericness in their briefing or at the hearing.  Nevertheless,

certain facts revealed at the hearing did provide some illumination on the issue.

For example, on cross-examination of Vista's owner Mr. Gopalan, testimony revealed the

fact that there is another company in New York by the name of Raga Records, which has been in

the business of producing Indian music since 1996.[14]  (Hearing Tr. 89:4-6)  Indeed, Vista even

does business with Raga Records, but has not taken any action against that company's use of the

arguably similar mark.  (*Id.* at 89:17-18, 90:2-4.)  At the hearing, Mr. Gopalan explained that

Vista has not sued Raga Records because "[i]t is a bona fide company."  (*Id.* at 90:7.)  In that

_____

[14] Raaga's counsel mentioned the names of other companies, but Mr. Gopalan was
unaware of their existence.  For example, Raaga's counsel suggested that there was a company in
California in 2000 by the name of Raag Music Store; a company in New York called Raga Indian
Music, Inc.; and another company named Raga Music Circle of New York, Inc.  (*See* Hearing Tr.
89:10-24.)

regard, it would appear that Vista would not be suing Raaga but for the fact that Vista believes Raaga's sale of music is done without proper copyrights.  In other words, Vista ostensibly would drop its suit against Raaga if only Raaga was a "bona fide company" in Vista's eyes.  But, as noted previously, this is a trademark action, not a copyright action, and Vista has admitted that it does not have standing to bring a copyright action against Raaga.  Mr. Gopalan's interests here were seriously called into question when he testified as follows:

> Judge, basically, ***raaga again is something you can't trademark***.
> It is basically a musical note.  It comes from Indian classical music.

(Hearing Tr. 51:2-6 (emphasis added).)  The Court recognizes that the witness was difficult to understand.  Indeed, Raaga's counsel did not cross-examine Mr. Gopalan on this statement, ostensibly because he did not understand that this statement was even made.  Nevertheless, it is a remarkable admission that cannot be ignored.  The Court, however, will not rest its decision on this statement alone.

Another example from the hearing buttresses the conclusion that the RAAGA mark is generic.  After stating that "you can't trademark [raaga]," Mr. Gopalan testified about when he started his first music store: "[s]ince we started a music store, we did call it raaga . . . we just thought [the term "raaga"] indicated the kind of music we were doing.  We were a full line of Indian music store."  (Hearing Tr. 51:7-11.)

With regard to the copyright issue, the Court notes that the parties spent considerable time at the hearing addressing the irrelevant issue of licenses that might or might not be owned by Raaga.  (*See, e.g.*, Hearing Tr. 74:19 to 78:15; *id*. at 136:1 to 148:25; *id*. at 158:6 to 186:25.)  While the lengthy colloquy between counsel and witness regarding licenses might have been time

well spent in a copyright action, this, again, is about *trademark infringement* wherein Vista has

no right to complain about Raaga's alleged transgressions against copyright owners.  It is a

fundamental precept of prudential standing that there is a "'general prohibition on a litigant's

raising another person's legal rights.'"  *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (quoting *Allen

v. Wright*, 468 U.S. 737, 754 (1981)).  There is no dispute that Vista does not have a right to

bring a copyright infringement action against Raaga.  Therefore, Vista's argument regarding

whether Raaga has licenses for the music it sells is addressed to this Court in the wrong case.

Indeed, Vista's argument regarding licenses would fall on deaf ears in every court in every case

because Vista does not have standing to make the argument.

      In any event, the Court finds that the term RAAGA is generic and therefore not entitled to

protection.  However, even if the term could have been saved from the genericness doctrine,

Vista still failed to establish that the term had secondary meaning.

### *b*)      Suggestive vs. Descriptive

      As an initial matter, the Court can easily dispense with Vista's argument that its RAAGA

mark qualifies as "suggestive" and therefore inherently distinctive.  "The descriptive-suggestive

borderline is hardly a clear one.  Its exact location in any given situation is hazy and only

subjectively definable.  The descriptive category almost imperceptibly shades over at its fringe

into the suggestive domain."  2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair

Competition* § 11:66 (4th ed.) (hereinafter "McCarthy"); *see Zatarains, Inc. v. Oak Grove

Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983) ("The labels are more advisory than

definitional, more like guidelines than pigeonholes"); *see also Berner Int'l Corp. v. Mars Sales*

*Co.*, 987 F.2d 975, 979 n.2 (3d Cir. 1993) (same).  "A term is suggestive if it requires imagination, thought or perception to reach a conclusion as to the nature of goods.  A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *A.J. Canfield Co.,* 808 F.2d at 297.  "If the mental leap between the word and the product's attributes is not almost instantaneous, this strongly indicates suggestiveness, not direct descriptiveness." *McCarthy* § 11:67.

Vista briefly argues that the RAAGA mark is "suggestive," rather than "merely descriptive," because it "sells all forms of South Asian music and film products" and its selection "is not simply limited to raggas [sic]."  (Pl.'s Br. at 6.)  In other words, "[w]hile a consumer may believe that [Vista's] goods or services may include raagas, a consumer would need a higher level of imagination to conclude that [Vista's] services encompass the sale of all types of South Asian music and film products."  (*Id.*)

In analyzing this issue through the lens of the relevant consuming public, the RAAGA mark almost instantly connotes something to do with Indian music.  It does not require much in the way of "imagination, thought or perception" to reach a conclusion that the nature of the goods being sold is music, and specifically Indian music.  *See A.J. Canfield Co.,* 808 F.2d at 297.  It matters not that Vista also sells South Asian music and film products.  *See In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 1346 (Fed. Cir. 2001) (rejecting argument that "mark is not descriptive because, although it suggests the nature of its services, it does not describe their full scope and extent" and concluding that "the mark need not recite each feature of the relevant goods or services in detail to be descriptive.").  To accept Vista's theory of suggestiveness would result in a regime whereby an entity could imbue his otherwise merely

17

descriptive mark with "inherent distinctiveness" merely by adding an ancillary product line. Furthermore, such a regime would eviscerate the "descriptive" category of trademarks and its critically important component of "secondary meaning."

Instead, the more reasonable approach is to look to the predominant or central feature of the mark-holder's product or service.  Here, Vista's predominant product is Indian/South Asian music.  The simple fact that it also sells films and books does not necessarily diminish the bread-and-butter of its business of selling music.  Indeed, a review of the newspaper articles that Vista attached to its Complaint demonstrates that Vista's stores are perceived by the Indian community as essentially music stores.  One article is titled "New music biz taking some hits" and shows a picture of the "vice president of Raaga Music."  (Compl. Ex. A.)  In the text of the article, it discusses the "new Indian music superstore" in Jackson Heights, New York.  (*Id*.)  Another article is titled "Raaga Imports South Asia to N.J.: Music Retailer Entices With Pop, Classical, Bollywood, DVDs."  (Compl. Ex. B.)  That article also refers to the name of the store as "Raaga Music" and highlights the "10,000-plus CD titles" in the Edison, New Jersey store.  A third article is titled "Of CDs and Raagas" and its subtitle states that the Vista owners "have tuned in to the niche market of Indian music in America."  (Compl. Ex. C.)  That article describes Vista's business as a "wholesale and retail music business" that was the "largest desi music store outside India."  (*Id*.)  Thus, the immediate connotation of the RAAGA mark is that of Indian music.

Again, it requires little, if any, imaginative leap to connect the two.  As a result, the mark is not suggestive, but instead is, at most, merely descriptive of the products sold.  The Court's finding that the RAAGA mark is at best merely descriptive is supported by the U.S. Patent & Trademark Office's similar finding.  (*See* Venkataramani Decl. ¶ 11-12, Exs. C-H.); *see also A &*

*H Sportswear*, 237 F.3d at 221 (concluding that a district court need not give weight "when the

PTO attorney did not review all the evidence available to the District Court" but that "an initial

PTO determination by an examining attorney may be considered").  Therefore, because the mark

is not suggestive, it does not qualify as inherently distinctive.[15]  *See Two Pesos, Inc.*, 505 U.S. at

769.  Therefore, assuming the mark survived the genericness doctrine, it still can be valid and

legally protectable if it has acquired distinctiveness through secondary meaning.  *See id.*;

*Commerce*, 214 F.3d at 438.


### *c)*      Secondary Meaning

As noted above, secondary meaning "is established through extensive advertising which

creates in the minds of consumers an association between the mark and the provider of the

services advertised under the mark."  *Commerce*, 214 F.3d at 438.  "A plaintiff must establish

secondary meaning in a mark *at the time and place* that the *defendant began* use of the mark."

*Id.* (emphases added).  The Third Circuit, in *Commerce*, set forth a "non-exclusive list of

[eleven] factors" to be considered in a "secondary meaning" analysis: "(1) the extent of sales and

advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of

copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals;

(8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11)

actual confusion."  *Commerce*, 214 F.3d at 438.

It is important to establish the correct time-line regarding Vista's and Raaga's use of the

_____

[15] As noted previously, the mark also is not arbitrary or fanciful and Vista does not argue
otherwise.

RAAGA mark.  Raaga asserts that it first began using the mark "in 1997 in connection with online services regarding Indian music, including online streaming."  (Def.'s Br. at 15.)  Vista asserts that it has been using the RAAGA mark "to sell South Asian music since 1995."  (Pl.'s Br. at 1.)  This alone is not dispositive because Vista bears the burden of demonstrating that not only had it begun *using* the mark before Raaga, but that the mark itself had acquired secondary meaning "at the time and place" that Raaga "began use of the mark."  *See Commerce*, 214 F.3d at 438.

        To support its argument of secondary meaning, Vista relies *exclusively* on the newspaper and magazine articles, attached to the Complaint and submitted at the hearing, which refer to Vista's stores as "Raaga Music" stores.  (*See* Compl. Exs. A-C.)  Two of the three articles clearly indicate that they were published in 2000.  The third article appears to have been published more recently because it focuses on the opening of the store in Jackson Heights, Queens, New York and the other two articles mention the various locations of Vista's stores, but neither mentions the Jackson Heights store.  Thus, all three articles were published approximately three years *after* Raaga began using the mark.  Moreover, only one of the articles appears to be a national publication from the United States, i.e., Billboard Magazine.  One of them is from "The Economic Times New Delhi" and the source of the third article, about the Jackson Heights store opening, is unclear.  At the hearing, Mr. Gopalan testified that it was from Newsday, but did not elaborate on that publication's circulation.  (Hearing Tr. 60:2-10.)  Regardless, Vista asserts that the Jackson Heights store opening "drew great attention in the *area* as well."  (Pl.'s Br. at 8 (emphasis added).)  Therefore, the mere existence of these articles, both in relation to their geographic scope and especially their publication dates, does little to support Vista's assertion

20

that the RAAGA mark had acquired distinctiveness through secondary meaning at the time and place Raaga began using the mark in 1997.

With respect to sales, Mr. Gopalan testified that in 1997, revenue for his only store, located in New Jersey, was "[p]robably about two million, I would say, probably." (Hearing Tr. 68:6.) The next year, when Vista opened its second store, this time in California, Mr. Gopalan testified that the combined revenue was "about three million." (*Id*. at 68:11.) While $2-3 million is nothing to sneeze at, Vista has failed to adduce evidence that this was a substantial portion of the overall Indian/South Asian music market. Viewed in a vacuum, the Court is unable to ascertain whether Vista's one or two stores had 1% or 99% of the market, such that secondary meaning could be established. Regardless, the sales figures merely demonstrate the possibility of secondary meaning around Edison, New Jersey in 1997 and adds Sunnyvale, California in 1998, the year that Raaga purchased the domain name. Moreover, Vista presented evidence totaling approximately $2,000 in advertising expenses in 1998. Again, it is not clear to this Court whether that is a large or small sum comparatively.

Interestingly, Mr. Gopalan testified that the highest sales Vista achieved occurred in 2004 at about $4 million, (*see* Hearing Tr. 68:22-24), but later testified that Vista's sales began declining starting in 2003, (*see* Hearing Tr. 84:10-11). And even later, Mr. Gopalan testified that he approached Mr. Venkataramani about purchasing the raaga.com domain name in late 2005 because he believed "it was a hobby site. . . .  It was just a bunch of guys getting music and I figured I could, I just wanted to buy the domain name." (*Id*. at 93:15-17.) Placed in bold relief, these statements suggest some important inconsistencies that have gone unexplained.

Despite citing, in its brief, to the exact page on which *Commerce*'s eleven factors for

secondary meaning can be found, Vista has failed to put forth sufficient evidence regarding the eleven factors.  *See Commerce*, 214 F.3d at 438.  Therefore, Vista has not carried its burden with respect to demonstrating a likelihood of success on the merits of proving that the RAAGA mark had a secondary meaning *at the time* that Raaga began using the mark in 1997.  Because Vista has failed to establish validity or legal protectability of the mark, this Court need not address the ownership or likelihood of confusion elements.

### 2.      Vista Does Not Have a Likelihood of Success on the Merits of Its Claim under the Anticybersquatting Consumer Protection Act

In addition to its more traditional trademark and unfair competition claims under the Lanham Act, Vista also alleges that Raaga violated the Anticybersquatting Consumer Protection Act (the "ACPA" or the "Act") by registering the domain name "raaga.com."

"The development of the Internet created new areas of concern, and in 1999 Congress passed the [ACPA] in order to prevent misappropriation of trademarks by stopping conduct known as 'cybersquatting.'"  *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 778 (8th Cir. 2004).  "Cybersquatting" is "an expression that has come to mean the bad faith, abusive registration and use of the distinctive trademarks of others as Internet domain names, with the intent to profit from the goodwill associated with those trademarks."  *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001).  For example, if someone not connected to the Coca Cola Company registered the domain name "cocacola.com" before the Coca Cola Company registered it, then that would be a typical example of cybersquatting.[16]  The individual who registered the domain name then would

---

[16] In *Shields*, the Third Circuit addressed a slight variation of the traditional cybersquatting phenomenon in that the plaintiff, who owned the trademark in "Joe Cartoon," had

attempt to sell it to the Coca Cola Company for a profit.

Cybersquatting has been described as the "Internet version of a land grab." *Coca-Cola Co.*, 382 F.3d at 778 (quoting *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir. 2002)); *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 267 (4th Cir. 2001). In essence, it forces "the rightful owners of the marks 'to pay for the right to engage in electronic commerce under their own brand name.'" *Virtual Works*, 238 F.3d at 267 (quoting S. Rep. No. 106-140, at 5).

To combat cybersquatters, the ACPA added section 43(d) to the Lanham Act, now codified at 15 U.S.C. § 1125(d)(1)(A), which provides in relevant part:

> A person shall be liable in a civil action by the owner of a mark . . .
> if, without regard to the goods or services of the parties, that person
> > (i)  has a *bad faith intent* to profit from that mark . . .;
> > *and*
> > (ii)  registers, traffics in, or uses a domain name that--
> > > (I)  in the case of a mark that is *distinctive* at the
> > > time of registration of the domain name, is
> > > *identical or confusingly similar* to that mark;
> > > (II)  in the case of a *famous* mark that is *famous at*
> > > *the time* of registration of the domain name, is
> > > *identical or confusingly similar to or dilutive*

---

already registered his trademark domain name "joecartoon.com." In that case, the defendant attempted to capitalize on the plaintiff's trademark by registering variations of the already-registered domain name, e.g., joescartoon.com, joecarton.com, joescartons.com, joescartoons.com, and cartoonjoe.com. The idea is that people seeking the legitimate joecartoon.com website will occasionally errantly type one of these variations. Entities will often register the errant variations of their domain name in order to direct and thereby capture the greatest number of individuals seeking the correct website. In *Shields*, the defendant understood this concept and purchased the errant variations in order to sell them to the plaintiff who had a significant interest in capturing the market of those seeking his site, but who accidentally or unwittingly typed in the wrong Internet address. The instant matter between Vista and Raaga is somewhat more typical under the ACPA in that the domain name registered is raaga.com and not a variation of it. Essentially, Vista wants the raaga.com domain name and alleges that Raaga is cybersquatting on it.

of that mark;

15 U.S.C. § 1125(d)(1)(A) (emphases added).  Thus, in order for Vista to recover from Raaga

under the ACPA, Vista must demonstrate that its mark is either distinctive or famous, *and* that

raaga.com is identical or confusingly similar (or dilutive, if famous) to Vista's mark, *and* that

Raaga had the bad faith intent to profit from Vista's mark.  *See Shields*, 254 F.3d at 482.

### *a*)  **Bad Faith Intent**

The Court need not determine whether the Vista's mark is distinctive or famous, nor need

this Court decide whether Raaga's use is confusingly similar or dilutive, because Vista has failed

to prove the element of bad faith intent on the part of Raaga.  Not surprisingly, there is yet

another long multi-factor non-exhaustive list to be considered in evaluating whether bad faith

exists.  The ACPA provides that "[i]n determining whether a person has a bad faith intent . . . a

court may consider factors such as, but not limited to":

> (I)     the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II)    the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III)   the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV)    the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (V)     the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
> (VI)    the person's offer to transfer, sell, or otherwise assign the

24

> domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
>
> (VII)   the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
>
> (VIII)  the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
>
> (IX)    the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).  Notably, immediately after this list of factors, Congress explicitly declared that "[b]ad faith intent . . . *shall not be found* in any case in which the court determines that the person *believed and had reasonable grounds to believe* that the use of the domain name was a fair use or otherwise lawful."  15 U.S.C. § 1125(d)(1)(B)(ii).  This subsection establishes both a subjective and objective component regarding the individual who purchased raaga.com.

At the hearing, Raaga demonstrated to this Court that Mr. Venkataramani subjectively believed his purchase of the domain was a fair use or otherwise lawful use of the RAAGA mark. (*See* Hearing Tr. 149:14-20.)  This Court credits that testimony and finds that Mr. Venkataramani had objectively reasonable grounds to believe that his use of the raaga.com domain was lawful because he was not aware of Vista's lone store in Edison, New Jersey when he began using the RAAGA mark in Australia in 1997.  Nor was Mr. Venkataramani aware of the Vista stores on

November 27, 1998 when he registered the raaga.com domain name.  Indeed, Mr. Venkataramani

testified that the first time he became aware of a Vista store was in 2002 on his way back from

lunch in Sunnyvale, California.  (Hearing Tr. 134:10-17.)

Furthermore, there is no indication that Raaga sought to divert consumers from Vista's

online location.  *See* 15 U.S.C. § 1125(d)(1)(B)(i)(V).  Indeed, it is not unreasonable to say that

<u>Vista</u> sought to divert <u>Raaga's</u> consumers by creating the myraaga.com site several years *after*

Raaga began operating raaga.com.  In addition, there is no evidence that Raaga tried to sell the

domain to Vista.  *See* 15 U.S.C. § 1125(d)(1)(B)(i)(VI).  As a matter of fact, the reverse occurred

when Raaga rebuffed Vista's courting advances in late 2005.  As a result, the ACPA dictates that

Raaga shall not be liable under the Act because there is no bad faith intent.

### *b*)        **Dilution under § 1125(c)**

In its Brief in Support of Motion for Preliminary Injunction, Vista also asserts that

Raaga's use of the RAAGA mark dilutes Vista's mark in violation of 15 U.S.C. § 1125(c).

Section 1125(c) now provides:

> Subject to the principles of equity, the owner of a *famous* mark that
> is distinctive, inherently or through acquired distinctiveness, shall be
> entitled to an injunction against another person who, at any time after
> the owners mark has become famous, commences use of a mark or
> trade name in commerce that is likely to cause dilution by *blurring* or
> dilution by *tarnishment* of the famous mark, regardless of the
> presence or absence of actual or likely confusion, of competition, or
> of actual economic injury.

15 U.S.C. § 1125(c)(1) (emphases added).  As the statute makes clear, there are two primary

forms of dilution: blurring and tarnishment.  "Dilution by tarnishing occurs when a junior mark's

similarity to a famous mark causes consumers mistakenly to associate the famous mark with the defendant's inferior or offensive product." *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000). By contrast, dilution by blurring occurs "when the defendant's use of its mark causes the identifying features of the plaintiff's famous mark to become vague and less distinctive." *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 168 (3d Cir. 2000). Here, Vista asserts that Raaga "is engaging in the unauthorized sale of copyrighted music and video from South Asia" and therefore Vista's "mark will be diluted beyond recourse through such false association." (Pl.'s Br. at 19.) In that regard, it would appear that Vista is asserting a claim of dilution by tarnishment.[17]

But first the Court must assess the mark's fame/distinctiveness. In determining whether a mark is distinctive or famous, the Third Circuit has articulated the following factors, culled from 15 U.S.C. § 1125(c)(1):

> (A)    the degree of inherent or acquired distinctiveness of the mark;
> (B)    the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
> (C)    the duration and extent of advertising and publicity of the mark;
> (D)    the geographical extent of the trading area in which the mark is used;
> (E)    the channels of trade for the goods or services with which the mark is used;
> (F)    the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;
> (G)    the nature and extent of use of the same or similar marks by third parties.

*Shields*, 254 F.3d at 482 (citing 15 U.S.C. 1125(c)(1)). A cursory review of these factors reveals

---

[17] Vista leaves to this Court the task of divining Vista's argument as to which form of dilution from which it suffers.

a marked similarity to the distinctiveness analysis, particularly the secondary meaning analysis, already performed above.[18]  Indeed, Vista acknowledges that "[t]he analysis under these factors substantially coincides with the secondary meaning analysis discussed earlier."  (Pl.'s Br. at 14.)

In that regard, this Court has already determined that the RAAGA mark is not inherently distinctive, i.e., it is not suggestive, arbitrary, or fanciful.  Indeed, this Court has already concluded that the mark is more appropriately deemed generic.  But even if the mark does qualify as merely descriptive, the analysis above demonstrates that Vista has not carried its burden in demonstrating a likelihood of success in proving secondary meaning.  With respect to the distinctive analysis, Vista again relies exclusively on the newspaper and magazine articles, without providing any other evidence regarding the other factors, e.g., extent of advertising, geographical extent of trading area, channels of trade, nature and extent of use of the same or similar mark by third parties.

Whether a mark is famous appears to be a different analysis.  "The key requirement is that the mark be famous, which the [statute] defines as 'widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner.'" *Green v. Fornario*, 486 F.3d 100, 105 (3d Cir. 2007) (quoting 15 U.S.C. § 1125(c)(2)(A)).  "This is a rigorous standard, as it extends protection only to highly distinctive

---

[18] Compare these factors to the ones articulated by the Third Circuit for analyzing secondary meaning for merely descriptive marks: "(1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion." *Commerce*, 214 F.3d at 438.  They also bear some relation to the *Lapp* factors, e.g., "(2) the strength of the owner's mark" and "(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media." *A & H Sportswear*, 237 F.3d at 215.

marks that are well-known throughout the country." *Id.* (citing *TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 99 (2d Cir. 2001)).

This is a significantly different standard than the acquired distinctiveness through secondary meaning standard because, under the latter, distinctiveness is analyzed through the lens of the relevant consuming public.  Under the standard of whether a mark is famous, the question is whether the mark is well-known throughout the country by the *general* consuming public, regardless of the *relevant* consuming public, i.e., Indian and South Asian music buyers. Under this more rigorous standard, it is clear that Vista has failed to demonstrate that its RAAGA mark was well-known throughout the country, especially not at the time when Raaga began using the mark as its domain name in 1998.  Therefore, Vista's motion for a preliminary injunction on the basis of dilution under § 1125(c) must be denied and the Court need not address the blurring and tarnishment elements of § 1125(c).[19]

---

[19] Even if this Court were to address the blurring and tarnishment elements, Vista's motion would still be denied because of one very important factor has not been addressed before and that weighs heavily against Vista: "delay by the senior user in bringing the action."  *See Times Mirror*, 212 F.3d at 168.  As discussed previously, Vista approached Raaga approximately in late 2005 in an effort to purchase or partner with Raaga.  When negotiations failed Raaga never heard from Vista again until March 2007 when Vista filed the instant Complaint.  This indicates that Vista knew at least as early as 2005 about Raaga's use of the mark and yet it still sat on its rights for another year and a quarter.

Moreover, there is a strong likelihood that Vista knew about Raaga's use of the mark as early as September 2000 when Vista registered the domain name myraaga.com.  Ostensibly, Vista could not register the more simple raaga.com because Raaga was already in possession and use of the domain name.  Thus, a strong argument could be made that Vista waited nearly *seven years* before attempting to pursue its rights to the mark.  In that regard, any blurring that occurred can easily be attributed to Vista's sitting on its rights, a fact that invokes the time-honored common law doctrine of laches.  That is, if Vista saw no rush to stop the infringing user of its mark, then it can hardly be gainsaid that Vista should not now be allowed to cry dilution.

### 3.   Irreparable Injury - Balancing of the Hardships

Vista's motion for a preliminary injunction will be denied because it has failed to carry its burden with regard to the most important of the four elements for granting a preliminary injunction, i.e., Vista has failed to demonstrate a likelihood of success on the merits. Nevertheless, the Court will now address whether irreparable injury will be suffered by either party regarding a grant or denial of the injunction. *Opticians*, 920 F.2d at 191-92. Furthermore, assuming one party will suffer some irreparable injury, the Court will engage in a balancing of the hardships to determine which party should suffer more. *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 727 (3d Cir. 2004) ("If temporary relief would irreparably harm an alleged infringer pending final disposition of the case, the court should 'balance the hardships' to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the mark's owner.") (internal quotations and citations omitted); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) ("Before granting an injunction, a district court must balance the relative harm to the parties, i.e., the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued.").

"Irreparable harm must be of a peculiar nature, so that compensation in money alone cannot atone for it." *Opticians*, 920 F.2d at 195 (internal quotations and citations omitted); *see also Kos Pharm.*, 369 F.3d at 727. "Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will." *Id.* "Lack of control over one's mark 'creates the potential for damage to . . . reputation[, which] constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case.'" *Kos Pharm.*, 369 F.3d at 727 (quoting

*Opticians*, 920 F.2d at 196.).  "A finding of irreparable injury can also be based on likely confusion. . . . [W]here the plaintiff makes a strong showing of likely confusion, irreparable injury follows as a matter of course."  *Opticians*, 920 F.2d at 196.

If Vista had established likelihood of success on the merits, then its lack of control over the mark utilized by Raaga, as well as the loss of trade and good will, would likely be an irreparable harm of such a peculiar nature that money damages alone would be insufficient. Here, however, Raaga's continued use of the mark does not directly interfere with Vista's use of hte mark for the purposes of a brick and mortar store selling CDs.  Nor does it inhibit Vista's use of myraaga.com to sell CDs.  Nevertheless, the fact remains that Vista has not demonstrated a likelihood of success and therefore any irreparable harm is at best speculative at this juncture.

By contrast, Raaga would suffer significant irreparable harm were this Court to enjoin its use of the mark because its use is precisely the name of its website.  Any injunction would effectively shut down the website and shut out its millions of users.  Based upon likelihood of success at this point, an injunction would impact Raaga much more significantly than Vista. Moreover, an injunction seems particularly inappropriate in this context where Vista has clearly known of Raaga's existence for years and is just now seeking to assert its rights.  This is not a situation where Vista has been using the mark for many years and Raaga just recently entered the marketplace and attempted to capitalize on Vista's mark.  Therefore, any likely confusion is as much attributable to Vista as it is Raaga.  As a result, the balance of the hardships weighs in favor of denying the preliminary injunction.

4.      **Public Interest**

Finally, the Court must also assess the public interest in whether an injunction should

issue.  *See Opticians*, 920 F.2d at 191-92.  "Public interest can be defined a number of ways, but

in a trademark case, it is most often a synonym for the right of the public not to be deceived or

confused."  *Id*. at 197.  "'As a practical matter, if a plaintiff demonstrates both a likelihood of

success on the merits and irreparable injury, it almost always will be the case that the public

interest will favor the plaintiff.'"  *Kos Pharm.*, 369 F.3d at 729 (quoting *American Tel. & Tel.*

*Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)).  Arguably,

the corollary is also true: if a plaintiff fails to demonstrate likelihood of success and irreparable

injury, the public interest factor will favor the defendant.  Such is the case here.  There is nothing

to suggest that the public is being deceived or confused by the dual use of the RAAGA mark.  As

a result, the public interest factor also weighs in favor of denying the injunction.


C.      <u>**Summary**</u>

Vista does not have a likelihood of success on the merits of its claims for Lanham Act

and common law trademark infringement and unfair competition.  First, Vista has not

demonstrated the validity or legal protectability of the RAAGA mark.  As an initial matter, the

Court finds that the RAAGA mark qualifies for the lowest rank of "generic" and therefore is

without protection for either party.  Alternatively, the mark at best qualifies for the "merely

descriptive" category because it does not rise to the level of the "suggestive" category, which

requires some higher level of imagination to get from the mark to the owner's goods/services.

Moreover, even if the mark qualifies as merely descriptive, Vista has not sufficiently

demonstrated that its mark had acquired distinctiveness through secondary meaning at the time that Raaga began using the mark in 1998.  At best, Vista's mark had acquired distinctiveness only within a reasonable geographic proximity to its Edison, New Jersey store.

Second, Vista has not demonstrated proper ownership of the mark.  That is, Vista appears to be the senior user of the mark because its Edison store predates Raaga's website, but Vista has not demonstrated the nature and extent of its usage.  As a result, it appears that Vista is the owner, but only in a discrete geographic area around Edison and perhaps one or two other stores.

In addition, Vista does not have a likelihood of success on the merits of its claim under the Anticybersquatting Consumer Protection Act.  First, Vista has not demonstrated that its mark is distinctive, i.e., it had not acquired secondary meaning outside of a small area.  In addition, Vista has not come anywhere close to demonstrating that its mark rises to the level of famous, i.e., well-known on a nationwide scale and not just to the relevant consuming public.

Second, Vista *has* demonstrated that its mark is identical to Raaga in that they both use the same transliterated Hindi word to refer to their similar businesses of selling Indian music. However, demonstration on this element alone is insufficient to succeed on the merits of an ACPA claim.

Third, Vista has utterly failed to demonstrate the crucial element of bad faith intent on the part of Raaga.

Fourth, Vista's argument regarding dilution under § 1125(c) has failed to demonstrate a likelihood of success on the merits.  That is, a prerequisite to recovery for dilution under § 1125(c) is that the mark be famous, something Vista has failed to demonstrate.  Regardless, Vista has not demonstrated that the mark has been or will be diluted by blurring because Vista sat on

33

its rights and waited too long to bring such action.  Therefore, any blurring can be more appropriately attributed to Vista rather than Raaga.

Finally, Vista has failed to demonstrate that it will suffer irreparable injury if the injunction is not issued.  Even if such injury to Vista were conceivable, the balance of the hardships favors denying the injunction because Vista waited so long to bring the action. Moreover, the public interest would not be served by granting the injunction and shutting down Raaga's business absent a better showing of likelihood of success on the merits.

### Conclusion & Order

For the foregoing reasons, Plaintiff Vista India's motion  (Docket No. 3) for a preliminary injunction is hereby DENIED.

Newark, New Jersey
Date: August 6, 2007

                                        s/ Harold A. Ackerman
                                        U.S.D.J.

34